Mr. Connolly, Ms. Bustos, you will each have 15 minutes for your argument. You may begin when you're ready. Good morning, Your Honors. May it please the Court, my name is Thomas A. Connolly. I represent Brooke Sienna and her mother Christine, appellants here and plaintiffs below. This case is about whether the state, acting through a psychiatrist found by the district court to be a state actor, could administer antipsychotic medication to a nonverbal autistic child without parental informed consent or a specific court order authorizing that treatment. Why does there need to be a specific court order authorizing this treatment when there was a court order allowing for the care of Brooke and also that court order for psychiatric treatment, if you look back to the statute that's referenced, covers the administration of various medications including the one that was ultimately administered? Your Honor, first of all, the court order making Brooke a temporary ward of the court and assigning her to the custody of DCS was made only on probable cause based on the verified allegations of the order that says DCS may obtain medical treatment for acute psychiatric care, I think it says, and the statute says treatment for acute psychiatric care includes stabilization medication. So I'm looking for this sort of perspective of Dr. M. L. A. Kaye, however you pronounce his name. I pronounce it as Malak. Malak, okay. It might be Malak. Dr. Malak. Your Honor, let me address that. He's got a court order that says you could administer stabilization medication. Everybody agrees it's a stabilization medication. It's listed in the group of stabilization medications that DCS puts out that people can give. Your Honor, the problem with that order is, first of all, nobody disputes that Brooke needed care. Her mother herself has put her inpatient before, and so there's no... And you had filled out forms to put her inpatient at Aurora, right? As I understand, what happened is she followed the transport from Abrazo to Aurora, correct? And then I think the complaint alleges that she ended up filling out the paperwork to admit her daughter to Aurora, correct? It may be true. I know that her mother has put her inpatient before in the past. She was inpatient at St. Luke's. No, but this record is clear. Okay, so, yeah, I don't mean to take out attention, but... But nobody disputes that Brooke needed care. There's no dispute that the mother didn't even contest that motion. So what's the problem with this order that I think you were starting to talk about? Right. The September 4th order... Well, let's look at the August 31st order first, because that's the first order that was entered. Well, the August 31st order was only... That was the date of DCS's motion for inpatient care, was August 30th, and then there was the August 31st order, and it was a 72-hour order. Okay. There was no... The court did not consider the question of antipsychotic medications such as Haldol. It was just a general order under the statute, as you said, under ARS 271-8C, allowing for inpatient acute psychiatric care. Which will go on when you read the statute. Acute psychiatric care includes stabilization medication. Absolutely, Your Honor. That specific subsection, 271-8C, includes medication stabilization. That is ordered as a treatment category, but it's not as a sufficient process for a forced medication as consequential as psychotic medication as Haldol. When do you allege that the first administration of Haldol occurred? It occurred on September 7th, two weeks after Brooke had already been at Aurora. So I have a question about that. 2ER-121 is an informed consent form that shows consent was received from DCS for the administration of Haldol. What is the significance of that? Well, the primary significance is that DCS's consent was nowhere near informed. That consent was received after hours. It was a nurse on Dr. Malak's staff who contacted DCS hotline after hours, spoke to an after-hours operator who did not know Brooke Sienna, did not have any clue about her medical history, including the history... ...that this document does not provide sufficient consent for the administration of the medication. What I'm struggling to understand is you don't need this informed, that Aurora and Dr. Malak was relying on the fact that there had been a court order that was issued by the Superior Court on, I think it was the September 4th, the 2nd. So there was one on the 31st for the 72 hours, and then there was a subsequent order that was issued by the court prior to the administration of the drug on September 7th, which is the date that you allege the first dose was administered, correct?  So how do you get past the fact that there was a court order in place? Let's go back to DCS's motion. DCS's motion seeking authorization for inpatient care, first of all, was not contested by the mother. Everybody agreed she needed care. DCS, by the statutes required to attach to their motion, a report from the doctor at the facility explaining why inpatient care was necessary. In that report, Dr. Malak included his plan for treatment, and buried in that plan is his plan to use his stated intention to medicate Brooke with Thorazine. Thorazine is a much lower potency, much lower risk profile drug than Haldol. Haldol is the strongest potency, the highest risk factor. Plaintiff's expert said that you'd never use Haldol with adolescents because of its potency and its risk factor. That may set up a malpractice case. I get to talk. I'm sorry. Just the way it works. I'm focusing on the only defendant in this case. You may have a great case against DCS. You're pursuing it elsewhere. We've settled it already. Yeah, okay, and you may have got a lot of money on it. I don't need to know. Talk about Dr. Malak here. There's a court order, which I read on its face as saying you can give stabilization medication, and if you call DCS and get their consent, and he does. So what did he do wrong? What did he do wrong, not DCS? Right, what did he do wrong? The problem here is the order only allows for treatment in general. It doesn't allow the bureaucratic language of medication stabilization does not encompass such a critical antipsychotic medication. So if I disagree with you on reading the order, and I read the order on its face as allowing him to do this with DCS's consent, what did he do wrong? He failed to get informed consent. He knew he needed consent. What case can you point to for the proposition that he needed informed consent from the mother in light of the court order that was in place at the time that the drug was administered? I would point to Washington v. Harper as a case that says an informed process is necessary, an informed due process situation. But there was due process leading up to the court order that approved inpatient psychiatric acute care. And so if that's, if you go from that premise, why didn't the court order allowing for inpatient psychiatric acute care combined with the statute that defines that term, why wasn't that enough to permit Dr. Malak to do what he did? Because of the nature of the care that he was looking to administer. He himself recognized that he needed to get additional consent. He knew he had to go beyond that. Well, I guess what I understood Judge Desai's question to be, he may have thought that, but is that true as a matter of law? I suggest that it is, Your Honor, based on Washington v. Harper, based on Benavidez, you know, one of this district's cases. Benavidez talks about sort of the context of physical examinations, that there needs to be the opportunity to be present after there is notice, consent, or a court order, then the opportunity to be present. Right. There was no, there's no claim in this case, nor did Brooke's mother request to be present. I think you're sort of, Benavidez, I don't think really does much work for you in this case because it's not a case about informed consent. It's a case about having an opportunity to be present for the examination after there's already consent or a court order. And I don't read the complaint or any of the arguments you're making in this case to be one for a request to be present. No, that's not the complaint here. Your complaint is that you didn't consent. The complaint is that there was no due process sufficient to administer such a consequential and high-potency drug to a minor. Well, let me ask the question differently. If you, if Christina, I think, or Christine, if they called her up and she had consented, was any additional process needed? No. Okay. If she consented, there was no additional process needed. Your complaint is that she wasn't called up and asked to consent, correct? No. That's not the complaint. Because there was, there was eventually a conversation between Dr. Malak and the mother, which occurred on September 12th. And she objected to. Now I'm completely lost. If your complaint is not that your client, Christine, wasn't asked to consent to this, then I have no idea what your complaint is. The complaint is that. This is not a malpractice case. Well, there's a state claim. I know, but. And you may have a good argument for the fact that there was medication that is, you know, administered that was not, that was below the standard of care. I think what we're, I am willing to grant you that Washington v. Harper, which occurs in sort of the prison context, and some of these other cases that we have, Mann, et cetera, that occur in the physical examination context, require something. They require some matter of notice and consent or a court order. But here there is a court order. And what happened, sir, on September 12th with respect to the communication between Dr. Malak and Christine, is precisely what the court order required, which is for there to be some communication with the parent that she would not have the opportunity to dictate, ultimately, the care, but that the doctor would take that into consideration, which is what he did. You're conflating two different orders, Your Honor. The order you just described where it required input from the mother, that comes on October 17th, well after the Haldol, well after Brooke was being weaned off the Haldol. Okay, so Dr. Malak is having these communications with the mother even before there's a court order requiring it, but he's doing it, but he also has a court order in place that is authorizing this psychiatric care. He didn't even believe that the court order that existed was sufficient for him to administer Haldol. He reached out to the department to get consent. Because the court order required consent from DCS, did it not? No. Not if your Honors, if this panel believes that the September 4th order was sufficient to administer Haldol, then there was no reason for Dr. Malak to go back and ask for consent. Well, he could be being extra careful, and there's nothing that says that if you're extra careful, you get into worse trouble than if you weren't. I don't, excuse me, I don't read the original order approving inpatient psychiatric acute care services as requiring advance notice or advance consent from DCS. I think it all comes down to Washington v. Harper. You can't go administering an antipsychotic drug which plays with your brain's chemical balance without a more rigorous due process. Well, the due process led up to this order. There are several kinds of due process, but this order wasn't just written by the court with no input from anybody. I understand that, Your Honors, and I'm running out of time, and I did intend to reserve some time for rebuttal. Let me just say before I sit down that even if the court doesn't want to expand the constitutional issue, it can rule on a more narrow basis that the district court exceeded its bounds by deciding factual questions in Dr. Malak's favor instead of finding them to be questions that ought to be heard in a trial setting rather than a summary judgment setting, and I'd like to reserve... You have no time left, but I'll put two minutes on the clock for you for rebuttal. Thank you, Your Honor. May it please the Court, Rita Bustos on behalf of Dr. Malak. This case asks whether a psychiatrist violated the Constitution by treating a severely autistic nonverbal teenager who was punching other patients, inducing seizures, and requiring physical restraint after the juvenile court approved inpatient psychiatric acute services... So this isn't a situation where there was sort of an emergency. In Washington v. Harper, we talk about the danger to himself or others or the sort of really acute circumstance. In this case, we had a minor that had been taken to the hospital where I think the acute situation was addressed. She was stabilized at the hospital and then transported to the inpatient facility at Aurora where I think your client worked and, in fact, was stable enough that there was no administration of this particular drug that's being contested for a number of days after she had been admitted. So you would agree with me that there isn't this... What you're talking about, the punching, the kicking, the restraints, et cetera, that wasn't the basis for the care that was provided. Well, it was... Yes, there was no emergency situation, Your Honor. That's absolutely correct. And let's talk about Washington v. Harper, which is where a prison inmate challenged the involuntary administration of antipsychotic medication. And the Supreme Court in that held that due process permits this involuntary treatment, right? If there's a serious mental illness, is he dangerous to himself or others, and the treatment is in his medical interest. And the Supreme Court in that case upheld an administrative hearing before a committee of medical professionals, not a judge, as constitutionally significant. But you don't really even need that hearing. There was a court order in the case. Exactly, exactly. And that's exactly the point that I was getting to, Your Honor. In this case, there was actually even more process than what was found sufficient in the Harper case. In this case, we do have, as pointed out by Your Honors, we have four escalating hearings by the juvenile court. On June 27, 2018, they ordered Brooke committed to the legal care, custody, and control of DCS. And critically, they expressly authorized DCS to consent to evaluation and treatment for medical care upon recommendation of the health care provider. Do you have any of the documents that were signed by Christine, the mother, at the time that she brought or admitted her daughter to Aurora? I haven't been able to find those in the record. I understand from the complaint that she was involved in, you know, filling out paperwork. And I'm just curious to know sort of at the facility whether that paperwork includes some broad consent. So putting aside for a moment the fact that there's a court order eventually for this care, can you talk to me at all about the documents that were completed by the plaintiff herself? Yeah, unfortunately, Your Honor, I don't know specifically in the record where that medical paperwork is for the admission to the Aurora facility. Would it typically include consent for care or for the administration of medication? Typically, paperwork to admit to a mental health facility like Aurora would include some sort of— But you don't know if they're in the record or not. I don't know. I mean, one thing to say, you don't know where they are in the record. I guess we're trying to figure out whether you have any— you can help us by telling us whether they are in the record. You know, I'm very—I apologize, Your Honor. That was not something that I was prepared to discuss, given the fact that we do have court orders in this case that provided DCS specifically. You know, it provided DCS that they were able to—the custody by clear and convincing evidence, and they had—they were able to make inpatient psychiatric acute care services for Brooke in this case. Well, DCS isn't—it's not enough to get DCS's consent. DCS is not—had temporary custody. The facility needed either consent of the parent, who still had some consent, or a court order. You're not arguing that the DCS consent is enough? No, they needed a court order. Absolutely, Your Honor. There needed to be a court order. The court order provided DCS this authority to provide inpatient acute psychiatric services, which included medical stabilization. And that court order provided DCS the authority to provide the consent to administer this medical— So did—I want to return to a point your friend made. Did Dr.—was Dr. Malak required by the court order to obtain DCS's consent before administering this medication, or could he have done so solely on the basis of the court order? Your Honor, I think he may have been able to do so solely on the basis of the court order, except that the court order provided this specific authority to DCS to provide. If it's that broad, I find it troublesome, because you've been using Thorazine. It doesn't work. That's what the record shows. You want to escalate and do something higher. Is this just all left up to the judgment of the doctor under the court order, or doesn't he have to—doesn't he—if this girl weren't in the temporary custody of the State, there wouldn't be any doubt that you should try to get the parent's consent before administering the next drug. Whether or not that consent was given in a—you know, in the admission documents, we can't tell. So here we know they're in temporary custody of the State. It does seem to me you have to ask DCS for its consent to escalate here, don't you? Well, Your Honor, I would concede that because the factual circumstances in this case are such that Dr. Millock did get DCS's consent, then it's almost a moot point whether or not he actually needed to get that consent or not. So my next question is, how far does this order extend? I mean, one of the things that's potentially troublesome about dealing in this area is that maybe the doctor gives something he doesn't need to give, and that had somebody been consulted or the court been consulted or the mother been given the opportunity to show up, she would have said, sure, I was fine with Thorazine, but not Haldol. So how far does the order extend? It surely can't—it surely can't authorize the administration of everything, can it? Your Honor, the order would extend as much as what medication stabilization would require. And I think Your Honor himself pointed out that Haldol is one of the listed medications provided that can be provided for medication stabilization. And I agree there obviously would be some sort of limits to that, but in this case that limit wasn't passed. So this takes me back to a question that I don't think we asked the other side, which is this. I understand why Dr. Malak, in this circumstance, could say, it says stabilization medication, I called DCS, they said fine, I'm aware of the DCS guidelines, it's listed there as a stabilization medication. But you don't raise a qualified immunity defense in this case. No, we did not raise a qualified immunity defense. So the issue isn't whether or not he reasonably could have believed his actions were okay, but rather whether or not his actions were constitutional.  I won't ask why you didn't raise the defense. So is our analysis a little bit different than whether he acted reasonably under the circumstances? Your Honor, no. I mean, the analysis here specifically as to whether or not, and what plaintiff has argued is that there was a constitutional violation of the parent's interest in the care, custody, and control of her child. And that's a fundamental liberty interest, but it's not absolute. And so what we need to look at here is courts have recognized that there are two circumstances in which the parental decision and the right to care, custody, and control, specifically for medical decisions, may step aside. And the first is whether there's a formal hearing with a neutral adjudicator, you know, there has to be fundamentally fair procedures, and then second, whether there's an emergency situation. And in this case, we have that first circumstance, right? We have the first circumstances where there was a neutral adjudicator providing fundamentally fair procedures. Here, there were four separate procedures. So what case would you have us sort of base this decision on? Because as I have looked, and maybe I haven't found it, but I don't see that we have a case that arises specifically in the context of the administration of medication or care for minors when there is a psychiatric issue. We have these cases that arise in the prison context, and we have these cases that arise in the medical examination context, which seems much more like an acute procedure, sort of a one-time event. So what case are you relying on or do you think we would rely on to sort of advance the argument that you're making? Okay. Well, Your Honor, I don't know if I can point to one specific case, but I can point to, you know, the cases which say that these fundamental rights are not absolute, including the Mueller case, and that interfacials may interfere with these parental rights if the parents are provided with fundamentally fair procedures, which is the Keats case. And the courts, again, have recognized these two circumstances, which comes from the Pope case. And so what this court needs to look at is whether or not there were fundamentally fair procedures. And then in order to look at that, we have to look at the Arizona Authority and the Arizona statutory scheme here. The orders of the court, of the juvenile court, followed Arizona's statutory framework, including ARS 8-821, where the juvenile court may authorize DCS to take temporary custody upon finding a probable cause. 8-824, the court has to hold a hearing to see whether continued custody is clearly necessary. And then under 8-272, inpatient psychiatric acute services require court approval by clear and convincing evidence, which is what happened here. So, again, we're looking, this court is looking at whether or not there were fundamentally fair procedures in order to impinge on the parents' fundamental right to the care, custody, and medical treatment decisions of their children. And then you have to look at the Arizona statutory scheme and what specifically happened here in the juvenile court to figure out whether or not these were fundamentally fair procedures. And they were. And what culminated in the September 4th juvenile, the order, which they found by clear and convincing evidence that Brooke was suffering from the mental disorder and was a danger to herself or others, and they said that inpatient acute psychiatric services were permitted, which include medication stabilization. And as Judge Horwitz pointed out, we're looking at this from the perspective of Dr. Malak. He is a psychiatric provider at an acute care facility. He has a patient who he believes requires medication stabilization. Well, he's a state actor in this particular case. He is. We haven't, we didn't dispute that. So he's providing this service to his patient. He believes that this medication is required for medication stabilization. This is also, it's important to note as well, that this is also a medication. Haldol was administered to Brooke before she even came to Aurora at the Abrazo Healthcare Hospital. So this was a medication that was given to her there for stabilization, which plaintiff does not seem to have issue with. And then Dr. Malak, you know, with his patient decides that this is what she needs for stabilization. You have a court order in place that provides for medication stabilization, and he specifically did get the consent from DCS to provide this medication. And it's also important to note that he did reach out to Christine several times, at least. Wasn't that disputed? He says he did, but she testifies, I looked at my phone and there's no messages on it. Maybe not credible, but that's not an issue at this point. Well, exactly. So, yes, they do argue that Christine did not receive these contact requests. If this were a case about whether or not she was required to receive notice of this specific medication, and I sort of take Judge Graber's point that she had notice of a process that led to it, but that's not what they were talking about. They're talking about the absence of consent. They're not talking about the absence of notice. Exactly, Your Honor. They are. They're talking about the absence of consent. And, of course, our position is that they did not, Dr. Malak did not need Christine's consent to provide the medication stabilization. And, therefore, in your view, he didn't need to try to contact her either? Well, if you go to the October 17th order, which was after the hospital administration, that's later. Under the order that existed, did he have, under the Constitution, did he have an obligation, well, let me ask the question. Under the Constitution, did he have an obligation to contact, try to contact? Well, Your Honor, yes. If we, if, first of all, if we go back, there's two separate arguments, and we've argued this in our brief, too, that Dr. Malak, even absent the court orders or, well, with the court orders, did satisfy constitutional requirements, which is to notify the parents, obtain either parental consent or a court order in advance, and permit the parent to be present. But if that's just what I'm, I'm not sure you want to make this argument. That's why I'm asking it. If the Constitution requires that he notify the parent, there seems to be a fact dispute about whether or not he did in this case.  Yes, and no.  Based on the first, our first argument, Your Honor, whether or not there was fundamentally fair procedures, which precipitated a court order, which provided Dr. Malak with the authority to provide medication stabilization, and DCS the authority to provide medication stabilization. No, there was no specific constitutional requirement that they notify the parents. And I don't read their briefing as focusing on absence of notice. Their briefing focuses on absence of consent by Christine. Exactly. I see that my time is up unless there's any more questions. It does not appear so. Thank you. Thank you. Your Honor, I don't think we concede that, that there was no requirement for notice. Well, you don't make any argument in your brief that there's a requirement for notice. Well, I think it's just a standard constitutional requirement. So we're supposed to make the argument for you? No, Your Honors. My, but the points I want to make right now. Why wouldn't there be notice simply because your client knew that there were, when DCS was seeking the order from the court, both the first one on August 30th and also again for the September 4th order, your client was, received notice, was obviously on notice that the filing had been made by DCS with the Superior Court, correct? Yes. For inpatient psychiatric care, correct? Absolutely. Okay. And for a trial of Thorazine, not Haldol. And because that's what Dr. Malak indicated. The court orders are for inpatient psychiatric care. There is no specific reference to either one of those drugs in the court order itself. I guess what I'm saying to you is there was notice to your client, perhaps not by Dr. Malak, perhaps when it filed for the court orders. There was no notice that Haldol was going to be administered. But why is that required when the statute, essentially it interprets the court order permitting acute inpatient psychiatric care to include all kinds of stabilization medications? The only thing the statute includes is a definition of acute care, which includes medication stabilization. Correct. That's my point. Which is authorized as a treatment. And it doesn't go on to say medication stabilization includes the administration of antipsychotic medications. If that exists anywhere, I heard this panel say that it was in the DCS. Excuse me. But as I understand it, Haldol is a stabilizing medication. It falls within that definition. I suppose a broad category of drugs fall within that stabilization from aspirin all the way up to Haldol. But if you're going to say that medication stabilization, that broad category as a statutory phrase, is a sufficient process for a forced administration of a psychotropic medication that is the highest potency with the highest risk profile for children and is contraindicated for use with children, then I think we might as well just throw Washington v. Harper and similar cases out the window because they're meaningless in that case. The reason the additional process was needed in Harper was because of the significant and severe consequences of the use of such a potent antipsychotic drug. And here again, Dr. Malak, he couldn't have reasonably believed the move from Thorazine to Haldol was sufficient under the court's order because he sought additional consent. And he was mistaken in his discharge summary. He says he sought DCS's consent but not Mother's because she had no legal rights. Again, that's just constitutionally incorrect. And so what I'd like to ask is that at a minimum this panel should reverse summary judgment because a jury could find a constitutional violation once actual objection was known and no individualized judicial authorization was sought. We're not asking for a rule that every medication decision requires a separate hearing. We're asking for a rule that an uninformed doctor cannot force or continue a major antipsychotic medication on a nonverbal minor in temporary state custody without one of three things, either informed parental consent, judicial authorization addressing the specific use of such a high potency drug, or an emergency necessity. Everybody agrees the emergency didn't exist here. So either parental consent was necessary or additional process. That's what we're doing. The state wants to override a fit parent on forced psychotropic medication. If it's going to do that, it must first do no harm by using the clear argument. I think we have your argument, counsel. Thank you very much. Thank you, Your Honor. Thank you both, counsel, for your helpful argument. The case just argued is submitted and that will conclude our arguments for today. We'll stand in recess. Thank you. Thank you.
judges: GRABER, HURWITZ, DESAI